# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

JIMI MILLER,               )
                             )
         Plaintiff,      )
                             )
        v.               )     CAUSE NO.: 4:08-CV-84-TS
                             )
MICHAEL J. ASTRUE,       )
COMMISSIONER OF SOCIAL    )
SECURITY,              )
                             )
        Defendant.     )

## OPINION AND ORDER

Plaintiff Jimi Miller appeals to the District Court from a final decision of the Commissioner of Social Security denying her February 25, 2004 application for a period of disability and disability insurance benefits. The Plaintiff claims that she is entitled to benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, because she has been disabled since May 2, 2003, due to ulcerative colitis, arthritis, degenerative disc disease, and fibromyalgia.

The Plaintiff's initial claim and request for reconsideration were denied. On December 27, 2006, a hearing was conducted by Administrative Law Judge Albert Velasquez (the ALJ).[1] On August 2, 2007, the ALJ denied the Plaintiff's application because she remained capable of performing her past work as an administrator and as an assistant director of an oral and written English program. (Tr. 12-19.) The Plaintiff filed a request for review, which was denied by the

---

[1] The Court takes judicial notice of the December 27, 2006 administrative hearing in which The Plaintiff testified in the presence of her counsel. (Tr. 570-604.) The hearing also included testimony from vocational expert and counselor Ray O. Burger. (Tr. 604-09.)

Appeals Council, making the ALJ's decision the final decision of the Commissioner.

The Plaintiff's November 12, 2008, complaint alleges that the ALJ's decision is not supported by substantial evidence and is contrary to law. Specifically, the Plaintiff contends that the ALJ improperly discredited her subjective report of symptoms and limitations, erroneously rejected the opinions of her treating physicians, Dr. Reibold and Dr. Dupre, in determining her residual functional capacity (RFC), failed to consider her mental limitations and Dr. Choate's consultative psychological examination, and misunderstood the nature of fibromyalgia and the effects of her physical ailments on her ability to work.

With jurisdiction established pursuant to 42 U.S.C. § 504(g), the Court affirms the decision of the Commissioner of the Social Security Administration based on the reasons that follow.

**BACKGROUND**

At the time of the ALJ's decision, the Plaintiff was a 61 year old woman with a bachelor's and a master's degrees in English, and past work experience as a field placement supervisor, early field experience coordinator, and assistant director. (Tr. 89, 93, 116.) The Plaintiff's alleged disability onset date is May 2, 2003, but her relevant medical history begins in late 1999.

In December 1999, having been diagnosed with fibromyalgia, the Plaintiff sought occupational therapy for strength training and fine motor coordination exercises. (Tr. 297-99.) From June 12, 2000, until September 11, 2002, the Plaintiff was a patient of Dr. Schweikher, a podiatrist. (Tr. 448-449.) After complaining of heel pain, the Plaintiff was diagnosed with a heel

spur and plantar fasciitis. *Id*. Treatment included cortisone injections, insoles, a compression anklet, and a home exercise program, but her plantar fasciitis would "sporadically improve and then regress." *Id*. Dr. Schweikher thought that the Plaintiff's foot problems likely stemmed from her fibromyalgia, and created "situations of rather significant disability where she is unable to stand, walk, or be active." *Id*. He indicated that "long lasting relief has been allusive [sic]," and that given her "co-morbidities, it is unlikely that we will be able to find a method of providing continued ongoing relief that will allow her to engage in activities that require extensive weight bearing or ambulation." *Id*.

On February 3, 2003, Dr. Kalwani, who specializes in internal medicine, identified "multiple trigger points and tender points over [the Plaintiff's] extremities and back." (Tr. 240.) Dr. Kalwani noted that the Plaintiff was under a lot of stress. *Id*.

Later that year, Dr. Kaluta, a rheumatologist, saw the Plaintiff on July 21, 2003, because the Plaintiff was complaining of "about ten years of diffuse muscle and joint discomfort" without any triggering event. (Tr. 222-25.) She also complained of intermittent joint swelling and pain. *Id*. She had "diffuse tenderness" over her forearms, arms, paracervical trapezius muscles, lower lumbar spine, trochanteric area, medial aspect of both knees, anterior quads, calf muscles, and the dorsum and plantar surfaces of her feet. *Id*. Her neurological exam and gait were normal. *Id*. Dr. Kaluta noted the presence of fibromyalgia tender points and opined that the "lack of any consistent physical findings is [] consistent with pain amplification syndrome or fibromyalgia." *Id*. Dr. Kaluta also raised the possibility of the Plaintiff's having depression and a conversion disorder. *Id*.

The Plaintiff was required to undergo an Internal Medicine Consultative Examination on

April 20, 2004 with Dr. Newton. (Tr. 158-61.) Dr. Newton noted that her gait and station were "unsteady." *Id*. The Plaintiff needed assistance getting on and off of the examination table and was using a cane for ambulation. *Id*. Dr. Newton reported that the Plaintiff was unable to walk on her heels and toes, unable to squat, and unable to bend all the way over and get back up. *Id*. The Plaintiff experienced tenderness with the palpation of the spine, her straight leg raise test was positive, and her neurological exam was normal. *Id*. Her range of motion was diminished in her cervical and lumbar spine. *Id*. Also for purposes of the State Agency's review, the Plaintiff's husband submitted a third party report, detailing the Plaintiff's increased physical limitations in carrying out her daily activities. (Tr. 102-15.)

Five months later, in September 2004, the Plaintiff's gait was normal, she was able to stand on her toes with some assistance, she was able to stand on her heels, and she had lumbar flexion of 90 degrees and extension to 10 degrees with some mild pain across the lower back. (Tr. 513.) During the examination, the Plaintiff's treating physician, Dr. Dupre, stated, "I am unable to really note any tenderness in the cervical, thoracic, or trapezius area." *Id*. The Plaintiff's generalized pain was noted to be a 5 out of 10 on a numeric pain scale, but the pain was lessened with medications. *Id*.

The following month, Dr. Reibold, the Plaintiff's treating neurologist, noted that the Plaintiff "suffers from fairly severe fibromyalgia in addition to diffuse degenerative disc disease of the cervical, thoracic, and lumbar spine" and that the pain had become difficult to control with medications. (Tr. 530.) Dr. Reibold opined that the Plaintiff was "100% disabled" because of fibromyalgia and diffuse degenerative disc disease. *Id*. In December, Dr. Reibold noted that the Plaintiff's cranial nerves were normal and that there was not much change in her symptoms over

the past month. (Tr. 529.) Subsequent to December 2004, Dr. Reibold's reports indicated that the Plaintiff's gait was essentially normal.

Dr. Dupre's December treatment notes indicated that the Plaintiff had "some problems with intermittent diarrhea." (Tr. 522.) Then on February 8, 2005, the Plaintiff had a follow-up appointment with Dr. Dupre for a flare-up of her ulcerative colitis. (Tr. 518.) While her bowels had returned to normal with the addition of Flagyl, she was "still experiencing intermittent joint aches and pains." *Id*. Dr. Dupre prescribed Cymbalta. *Id*. On March 24, 2005, the Plaintiff returned to Dr. Dupre complaining that she was not able to tolerate the Cymbalta, but denied any flare-ups of her ulcerative colitis. (Tr. 516.) She reported that "[h]er stomach has been doing fine." *Id*. From April 2006 through October 2006, the Plaintiff's ulcerative colitis was repeatedly reported as being "stable." (Tr. 490, 492, 496, 551, 553.) Further, the physician's reports indicated that the Plaintiff specifically denied nausea and vomiting. (Tr. 490, 492, 505.)

On May 3, 2005, the Plaintiff saw Dr. Greenwald for pain management, and they discussed various treatments for her chronic pain. (Tr. 512.) Dr. Greenwald noted that the Plaintiff "has been very active in her care" and has already tried many of the options they discussed. *Id*. Dr. Greenwald reported that the Plaintiff's pain and tenderness "waxes and wanes," but her medications and stretching exercises were controlling her pain, which she rated at a 5 out of 10. (Tr. 513.) The Plaintiff saw Dr. Greenwald for only this single visit. (Tr. 590.)

On June 24, 2005, the Plaintiff complained of problems with her fine motor skills to Dr. Dupre, who instructed her to report this problem to Dr. Reibold. (Tr. 511.) Also reported was the Plaintiff's ongoing problems with hyperlipidemia, because the Plaintiff could not tolerate medication to help with it. *Id*.

On October 4, 2005, Dr. Reibold noted that "over the past six months Jimi-has been fairly stable" but that "[s]he continues to have problems with pain. . . [h]owever the medication is controlling it fairly well." (Tr. 527.) The Plaintiff was also experiencing some difficulty with her memory. (Tr. 527.)

One day later, the Plaintiff saw Dr. Dupre as a follow-up to her hyperlipidemia and fibromyalgia. (Tr. 509.) While Dr. Dupre noted multiple trigger points, the Plaintiff reported that she did not have a problem walking 1 mile every 20 minutes, but she tended to become markedly fatigued when playing with her grand kids or doing other activities. *Id*. She also complained of occasional shortness of breath and intermittent joint and pelvis pain. *Id*.

On February 21, 2006, the Plaintiff had a follow-up visit with Dr. Dupre regarding her fibromyalgia and irritable bowel syndrome. (Tr. 501.) At this time, the Plaintiff continued to complain of intermittent back pain that improved with a high dose of Neurontin. *Id*. She also noted intermittent right lower quadrant pain. *Id*.

On April 4, 2006, Dr. Reibold reported that the Plaintiff had been "stable" and her pain tends to "wax and wane." (Tr. 526.) Dr. Reibold noted "some diminished range of motion in the claimant's neck and lumbar regions, but no signs of neurological impairment." (Tr. 529.)

Late that year, in December, a diagnostic gastrointestinal test revealed only "moderate gastroesophageal reflux." (Tr. 555.)

In a letter to the Plaintiff's attorney dated February 5, 2007, Dr. Dupre opined that the Plaintiff could not "tolerate repetitive activities, prolonged sitting, standing or walking, secondary to exacerbation of her medical problems, increasing pain, and increasing muscle spasms." (Tr. 538.) Dr. Dupre indicated that the Plaintiff "gets intermittent flare-ups of her

irritable bowel and ulcerative colitis due to stress and strain related to the exacerbation of the above in her work environment." *Id*. Dr. Dupre also reported that the Plaintiff "would not be able to handle repetitive small objects, packing light bulbs, typing, or handwriting for most of the day, secondary to exacerbations or her joint pain, muscle spasms, fibromyalgia, etc." *Id*. The Plaintiff's chronic fatigue would further limit her ability to sustain attention to tasks. *Id*. Dr. Dupre's treatment notes indicated that if the Plaintiff were able to find work, she would have to work reduced shifts and "would be likely to miss intermittent days during the year" due to her problems. *Id*.

Significantly, on February 12th, Dr. Dupre stated that the Plaintiff's reflux esophagitis and ulcerative colitis were "stable." (Tr. 545.) In March, Dr. Dupre noted that the Plaintiff was able to recently take a trip to Texas, and indicated that she "has been fairly stable. . . [s]he still has some intermittent joint aces and pains. . . [yet] denies any nausea or vomiting. . . any bowel problems . . .any blood in the stool. . . [and] any fevers, chills or night sweats." (Tr. 543.)

In a follow-up letter to the ALJ dated May 9, 2007, Dr. Dupre commented specifically on the Plaintiff's musculoskeletal pain and limitations, but he deferred to her treating neurologist regarding any medical evaluation of the Plaintiff's fibromyalgia because Dr. Reibold had "been treating her chronic pain, fibrositis and has her on the medications for this." (Tr. 511, 540.) Dr. Dupre described the Plaintiff's back and joint pain as "intermittent" (Tr. 501, 509, 518, 520, 543), and noted that the Plaintiff "still gets some intermittent joint aches and pains with the weather changes." (Tr. 545.) With respect to her ulcerative colitis, he noted that the Plaintiff was having diarrhea, which was "the only thing that really comes up." (Tr. 540-41.)

On October 3, 2007, Dr. Reibold opined that the Plaintiff's symptoms of chronic fatigue

and fibromyalgia are "genuine" and "severe enough that she is currently totally disabled for any type of gainful employment." (Tr. 564.)

Regarding the Plaintiff's emotional status, Dr. Lukens was the Plaintiff's treating psychologist on and off from 1987 until 2002, and knew the Plaintiff for over twenty years. Although no longer the Plaintiff's therapist, Dr. Lukens wrote a letter dated August 5, 2007, detailing the Plaintiff's psychological history, explaining her general observations of the Plaintiff, and describing how the Plaintiff's recent symptoms affected her ability to serve on a school board for a small private alternative school. (Tr. 565-69.) Specifically, Dr. Lukens noted the decline in the Plaintiff's physical and cognitive ability, observed that it was becoming more difficult for the Plaintiff to present herself as "intelligent, thoughtful, involved, and composed," and opined that the Plaintiff could not maintain any gainful employment. (Tr. 568-69.)

Earlier that year, on March 21, 2007, the State Agency had the Plaintiff undergo a psychological examination and take a Minnesota Multiphasic Personality Inventory-2 (MMPI-2) test with Dr. Choate. On mental status examination, Dr. Choate reported that the Plaintiff was oriented to person, place, and time, was attentive to the tasks requested of her, and seemed to put forth a good effort. (Tr. 455.) The Plaintiff did not show any evidence of a thought disorder and she did not report related symptoms, but her mental trend and thought content were logical. *Id*. The Plaintiff denied any homicidal or suicidal ideation. *Id*. Dr. Choate noted that the Plaintiff's affect was within normal limits and her mood was somber. (Tr. 456.) He also noted that the Plaintiff's speech was logical, coherent, and well polished, her eye contact was good, her concentration, persistence, and pace during the interview was within normal limits, and her immediate, recent, and remote memory functioning was appropriate, but her insight into her

behavior and the consequences of such behavior was limited. *Id*. Dr. Choate described the Plaintiff as cooperative in all aspects, and reported that her ability to interact with him was good. *Id*.

The MMPI-2 test results indicated that the Plaintiff tended "to have a somatic reaction particularly when she is under stress." (Tr. 456.) Dr. Choate noted that the Plaintiff "lack[ed] insight into her current psychological functioning" and that "many times individuals with a profile similar to hers will take on the role of an 'invalid' and will become passively dependent upon others." *Id*. The Plaintiff's scores were indicative of idiosyncratic thinking and "general confusion and cognitive disorganization," but not high enough to indicate schizophrenia. (Tr. 456-457.) Dr. Choate reported that individuals like the Plaintiff "tend to exhibit a great deal of denial" and focus on their physical complaints—notably, the Plaintiff's history revealed that those physical complaints were vague. *Id*. Dr. Choate opined that the Plaintiff showed signs and symptoms of a conversion disorder and also appeared to meet the criteria for dysthymic disorder, but noted that no other mental disorder seemed to account for all of her symptoms. (Tr. 457.) Dr. Choate documented that the Plaintiff has been depressed for many years, had symptoms which affected her motor functioning, and had psychological factors which appeared to be associated with her physical symptoms. *Id*.

Dr. Choate concluded that the Plaintiff's "symptoms do not appear to be intentionally produced" and her ability to work at this time would be questionable. (Tr. 457.) Yet, he noted that the Plaintiff "would appear capable of some type of simple repetitive work" (Tr. 457), and concluded that she was able to handle paperwork, do the laundry, cook, watch television with her husband, and take care of her grooming and hygiene, and was able to socialize regularly with

family members at picnics and dinners. (Tr. 455.) Dr. Choate assigned the Plaintiff a Global Assessment of Functioning ("GAF") score of 60. (Tr. 458.) *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 34 (American Psychiatric Association, 4th ed. 2000) (DSM-IV) (A GAF scale of 51-60 indicates moderate symptoms such as flat affect, or suggests moderate difficulty in social, occupational, or school functioning).

## HEARING TESTIMONY

The Plaintiff testified during the hearing that she has "pain everywhere" that "doesn't go away" and it feels like she has a bad case of the flu most of the time. (Tr. 580-81.) The Plaintiff complained of headaches, back and leg pain, occasional pain in her hands, and problems associated with irritable bowel syndrome and colitis. (Tr. 580.) She noted that she suffers from well-documented degenerative disease of the cervical, thoracic, and lumbar regions of her spine, fibromyalgia, and episodes of colitis. (Tr. 599.) While The Plaintiff was unable to identify a time in the past two years when she went to see a doctor because her pain was so intense (Tr. 585-56, 602), she indicated that she stopped working because she could not physically handle the work since there were days when walking was an issue and she could not sit upright. (Tr. 598.) She was also experiencing memory problems, confusion, and suffering from sleepless nights, which were some side effects from her medication. (Tr. 598, 605.)

As to the vocational expert's testimony, Ray O. Burger confirmed that given the Plaintiff's age, education, work experience, and the capability to perform sedentary work with environmental restrictions imposed by the ALJ, along with the ability to sit or stand at will, the Plaintiff could perform her past relevant administrative work as an assistant director. (Tr. 604-

05.)

# THE ALJ'S DECISION

The ALJ determined that The Plaintiff met the insured status requirements of the Social Security Act through December 31, 2008, and had not engaged in substantial gainful activity since May 2, 2003, due to the severe impairments of ulcerative colitis and irritable bowel syndrome, degenerative disc disease of the cervical, thoracic, and lumbar regions, and fibromyalgia. (Tr. 12-14.) However, The Plaintiff's impairments or combination of impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15-16.) After considering the entire record, the ALJ decided that the Plaintiff had the RFC to perform sedentary work[2] involving lifting and carrying 10 pounds occasionally and lesser weights frequently, sitting for 6 hours of 8 hours, standing and walking for 2 out of 8 hours, but involving no more than occasional climbing of ramps and stairs, no climbing of ropes, ladders, or scaffolds, and no crawling or kneeling. Due to the possible side effects of medication and the distraction caused by pain and fatigue, the ALJ further restricted the Plaintiff from operating a motor vehicle and from working around unprotected heights, dangerous moving machinery, and open bodies of water or flames. (Tr. 16-18.) With these work-related restrictions, the ALJ found that the Plaintiff was still capable of performing her past relevant work as an administrator and as an assistant director of an oral and written English program. (Tr. 19.)

---

[2] Sedentary work involves standing and walking for a total of approximately 2 hours in an 8 hour workday, sitting for about 6 hours in an 8 hour workday, and lifting no more than 10 pounds at a time. 20 C.F.R. § 404.1567(a); Social Security Ruling ("SSR") 96-9p.

**STANDARD OF REVIEW**

This Court's review of the Commissioner's decision is a limited one. Unless there is an error of law, the court will uphold the Commissioner's findings of fact if they are supported by substantial evidence. *Schoenfeld v. Apfel*, 237 F.3d 788, 792 (7th Cir. 2001). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In making a substantial evidence determination, the court will review the record as a whole, but will not reconsider the facts, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Williams v. Apfel*, 179 F.3d 1066, 1071-72 (7th Cir. 1999). That being said, the ALJ must "build an accurate and logical bridge between the evidence and the result." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). Thus, if reasonable minds could disagree on whether an individual is disabled, the court must affirm the Commissioner's decision denying benefits. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996). However, the district court is required to critically review the evidence and not simply rubber-stamp the Commissioner's decision. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

**DISCUSSION**

Generally, "[b]enefits are available only to those individuals who can establish disability under the terms of the Social Security Act." *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant bears the burden of showing, through testimony and medical evidence supported by clinical data and laboratory diagnosis, that she was disabled during the period in which she was insured. *Reading v. Matthews*, 542 F.2d 993, 997 (7th Cir. 1976) (citing *Jeralds*

*v. Richardson*, 445 F.2d 36 (7th Cir. 1971)). Furthermore, the claimant must show that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The regulations supporting the Social Security Act create a five-step inquiry for determining whether a claimant is disabled, under which, the ALJ must consider the applicant's claim in the following sequence:

1. Whether the claimant is currently employed;
2. Whether the claimant has a severe impairment;
3. Whether the claimant's impairment meets or equals one listed by the Secretary;
4. Whether the claimant can perform her past work; and
5. Whether the claimant is capable of performing any work in the national economy.

*See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citing 20 C.F.R. § 404.1520). The initial burden in steps one through four is on the Plaintiff; only at step five does the burden shift to the Commissioner. *Bolinger v. Barnhart*, 446 F.Supp.2d 950, 955 (N.D. Ind. 2006).

Here, the Plaintiff contests the ALJ's decision at step four of the sequential evaluation, finding that the Plaintiff had the RFC to perform sedentary work with some restrictions, and that the Plaintiff was capable of performing her past relevant work. The Plaintiff requests that the Court reverse the decision of the ALJ and award benefits, or remand the case for a fair hearing.

As discussed below, the Plaintiff's contentions are without merit because the record evidence establishes that the Plaintiff is not disabled and has the capacity to perform her past sedentary work.

**A.     Credibility of The Plaintiff**

The ALJ found that the Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms of which the Plaintiff complains, but that the Plaintiff's statements concerning the intensity, duration, and limiting effects of her symptoms were not entirely credible. However, the Plaintiff asserts that the ALJ did not follow the guidelines in SSR 96-7 when assessing her credibility. (*See* Plf.'s Opening Bf, DE 20, p. 15-16.)

With respect to credibility determinations, the ALJ is in the best position to observe the demeanor and veracity of the testifying witnesses. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). The court will not disturb the weighing of credibility so long as the determinations are not "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (citing *Carradine v. Barnhart,* 360 F.3d 751, 753 (7th Cir. 2004)). "Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported. . . can the finding be reversed." *Prochaska*, 454 F.3d at 738 (citing *Sims v. Barnhart,* 442 F.3d 536, 538 (7th Cir. 2006)). An ALJ may disregard a claimant's assertions of pain if he validly finds the claimant incredible. *Prochaska*, 454 F.3d at 738 (citing *Carradine,* 360 F.3d at 753-54). SSR 96-7p instructs that when "determining the credibility of the individual's statements, the adjudicator must consider the entire case record," and that a credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." *Prochaska*, 454 F.3d at 738. Once a claimant produces evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence. *Simila v. Astrue*, 573 F.3d 503, 517 (7th

14

Cir. 2009) (citing *Carradine*, 360 F.3d at 753). Instead, the ALJ must go beyond objective

medical evidence in the record and consider the following seven factors found in the social

security regulations in making a credibility determination:

> (1) the individual's daily activity;
> (2) the location, duration, frequency, and intensity of the
> individual's pain or other symptoms;
> (3) factors that precipitate and aggravate the symptoms;
> (4) the type, dosage, effectiveness, and side effects of any
> medication the individual takes or has taken to alleviate the
> symptoms;
> (5) treatment other than medication the individual receives or has
> received for pain or other symptoms;
> (6) any measures other than treatment the individual uses or has
> used to relieve pain and other symptoms; and
> (7) any other factors concerning the individual's functional
> limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 416.929(c)(3); *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (citing *Prochaska*,

454 F.3d at 738).

In the present case, the ALJ explicitly set forth these factors, and then went into extensive

detail regarding the Plaintiff's medical records, complaints of medical ailments, treatment and

medication received and effects of that treatment, results of medical tests, and the Plaintiff's

everyday activities and present appearance. For instance, while believing that the Plaintiff

experienced pain and physical restrictions associated with her documented fibromyalgia and

degenerative disc disease, the ALJ noted that there was no indication of significant disc

herniation or spinal stenosis, no signs of neurological compromise, no prescribed device

necessary for ambulation, no significant loss of strength in the Plaintiff's lower extremities or

signs of clinical atropy, and no more than conservative use of medical treatment, such as

medication and physical therapy, to manage her symptoms.

The ALJ also discussed Dr. Reibold and Dr. Dupre's office notes, which supported the determination that the Plaintiff's musculoskeletal impairments, fibromyalgia, and gastrointestinal problems were not disabling and did not preclude the Plaintiff from performing at least sedentary work. Aside from Dr. Reibold's November 2004 blanket statement that the Plaintiff was "100% disabled," he did not report any signs of neurological impairment. Instead, Dr. Reibold reported in December 2004 that the Plaintiff's gait was normal, in October 2005 that medication was controlling the Plaintiff's symptoms and she had been fairly stable for six months, and in April 2006 that her fibromyalgia was stable with pain that tended to wax and wane, but her symptoms were mostly controlled by medication. Dr. Dupre deferred to Dr. Reibold for an evaluation of her fibromyalgia, yet reported in November 2006 that her back pain was "intermittent," and in February 2007 that her joint aches and pains were "intermittent" with weather changes.

Further, although Dr. Dupre indicated in early 2007 that the Plaintiff cannot handle small objects, type, or write—these limitations were not consistent with the Plaintiff's regular daily activities as reported by Dr. Choate, also in 2007. Dr. Choate's report, which the ALJ specifically relied upon, questioned the Plaintiff's ability to work, but concluded that the Plaintiff appeared capable of some type of simple repetitive work, because she was able to handle paperwork, do laundry, cook, watch television, take care of her hygiene, and socialize regularly with family.

The ALJ also explicitly considered the Plaintiff's history of irritable bowel syndrome and ulcerative colitis, but found that while the Plaintiff experienced documented discomfort and diarrhea, she had no signs of gastrointestinal complications such as persistent nausea, vomiting, uncontrolled diarrhea, malabsorption syndrome, or malnutrition. Dr. Dupre's reports indicated

that the Plaintiff's symptoms were episodic in nature and oftentimes were stable. The ALJ further considered the Plaintiff's specialized gastrointestinal test which disclosed only moderate reflux. Observing the Plaintiff's periodic side effects from medication, the ALJ additionally considered the fact that the Plaintiff's physicians adjusted her medications as needed.

Based on the lengthy discussion of the Plaintiff's medical work-up over the years, which included consideration of factors that supported and did not support a finding of "disability," the ALJ appropriately explained why he found the Plaintiff's testimony to be exaggerated. The ALJ showed consideration of the entire record in making that determination, as is required by the social security regulations. *See* 20 C.F.R. § 404.1529(c); SSR 96-7p. Having plenty of reason to support his opinion that the Plaintiff overstated her symptoms, the ALJ built an accurate and logical bridge from the evidence to his conclusion that the Plaintiff indeed suffered the symptoms of which she complained, but to a lesser extent than claimed. The ALJ's credibility determination was not patently wrong.

**B.      Weight Afforded Treating Physicians' Opinions**

The Plaintiff argues that in making the RFC determination, the ALJ failed to give the medical opinions of her treating physicians, Dr. Reibold and Dr. Dupre, the controlling weight or deference required. (*See* Plf.'s Opening Bf, DE 20, p. 13-15; Plf.'s Reply, DE 26, p. 2-7.)

The Plaintiff is correct that a treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is (1) supported by medical findings; and (2) consistent with substantial evidence in the record. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (citing 20 C.F.R. § 404.1527(d)(2); *Skarbek v. Barnhart,* 390 F.3d 500,

503 (7th Cir. 2004)). However, a decision to deny a physician's opinion controlling weight does not prevent the ALJ from considering it, and the ALJ may still look to the opinion after opting to afford it less evidentiary weight. *Elder*, 529 F.3d at 415. Exactly how much weight the ALJ affords depends on a number of factors, such as the length, nature, and extent of the physician and claimant's treatment relationship, *see* 20 C.F.R. § 404.1527(d)(2)(i)-(ii), whether the physician supported his opinions with sufficient explanations, whether the opinion is consistent with the record as a whole, and whether the physician specializes in the medical conditions at issue. 20 C.F.R. §§ 404.1527(d)(3)-(d)(5); *Elder*, 529 F.3d at 415 (citing *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006)).

Furthermore, a claimant is not entitled to benefits simply because her physician states that she is "disabled" or unable to work, and it is the Commissioner of Social Security, not a doctor selected by the patient to treat her, who decides whether a claimant is disabled. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) (citing *Clifford*, 227 F.3d at 870); *see also Reynolds v. Bowen*, 844 F.2d 451, 454-55 (7th Cir. 1988) ("[t]he patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability . . . . The regular physician also may lack an appreciation of how one case compares with other related cases. A consulting physician may bring both impartiality and expertise . . . . Thus, while the treating physician's opinion is important, it is not the final word on a claimant's disability") (internal citation omitted). The ALJ also has the final responsibility for deciding a claimant's RFC, which is a legal decision rather than a medical one. *See* 20 C.F.R. § 404.1527(e); *see also* 20 C.F.R. § 404.1545 (the RFC finding is an administrative assessment of the most an individual can still do despite his or her limitations).

Notably, the Plaintiff's treating physicians did not offer an RFC assessment, nor specifically report that the Plaintiff could not perform sedentary work. Instead, the doctors offered a disability determination and imposed limitations on the Plaintiff: Dr. Reibold opined that the Plaintiff was "100% disabled" and Dr. Dupre opined that the Plaintiff could not tolerate repetitive activities, prolonged sitting, standing, or walking, handling repetitive small objects, packing light bulbs, typing, or handwriting for most of the day, and that, her chronic fatigue would limit her ability to sustain attention to tasks.

The ALJ discounted the doctors' opinions because their own treatment notes, as identified by the ALJ and as discussed in detail above, did not support a disability finding. Those records revealed that: the Plaintiff required no more than conservative medical management for her degenerative disease, fibromyalgia, and gastrointestinal symptoms; the Plaintiff was repeatedly reported as being "stable"; the Plaintiff's gait was normal and she had no signs of neurological impairment or finding of significant loss of strength in her lower extremities; the Plaintiff repeatedly denied nausea, vomiting and uncontrolled diarrhea; the Plaintiff only experienced "intermittent" symptoms and pain that "waxed and waned"; and, the Plaintiff's medication was controlling her symptoms despite "periodic" problems with side effects causing adjustments to be made.

Not only did the objective medical evidence support the ALJ's RFC determination, and contradict the limitations imposed by Doctors Reibold and Dupre, but the ALJ explained that the doctors' limitations were not consistent with: the way the Plaintiff presented herself at the hearing, the Plaintiff's regular daily activities, and the report of Dr. Choate revealing her physical activities, social tendencies, and showing no signs of impaired concentration, memory

loss, or other cognitive impairment. The tasks with which the Plaintiff involved herself on a daily basis and her ability to carry on a fairly normal routine reflected that she could sustain sedentary activity over an 8 hour work day.

Further, the ALJ did not err in discounting Dr. Reibold's opinion to the extent that Dr. Reibold relied on a "psychiatric interpretation," because the record reveals that Dr. Reibold was the Plaintiff's treating neurologist, and did not provide any basis for a psychological assessment or for any limitations based on her depression and cognitive deficits. *See* 20 C.F.R. §§ 404.1527(d)(3)-(d)(5). Similarly, it was not error for the ALJ to consider Dr. Dupre's comments regarding the Plaintiff's musculoskeletal and pain-related concerns, yet decline to fully accept the limitations reported, because Dr. Dupre was primarily treating the Plaintiff for her gastrointestinal problems. *Id*. Dr. Dupre even deferred to the Plaintiff's treating neurologist for an evaluation of her fibromyalgia and musculoskeletal impairments. *Id*.

The ALJ thoroughly discussed the objective medical evidence and explained why controlling weight was not afforded to the limitations imposed by the treating physicians. In making the RFC determination, the ALJ appropriately accounted for the Plaintiff's limitations that arose from the Plaintiff's medically determinable impairments, even those that were not severe. *See Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). The ALJ's RFC determination was, therefore, supported by substantial evidence.


**C.      Mental Limitations: Dr. Choate's Consultative Report**

The Plaintiff asserts that the ALJ "failed to consider any limitations due to the Plaintiff's mental impairments" and that the ALJ did not properly consider Dr. Choate's assessment which

is "inconsistent with the Plaintiff being able to do her past relevant work." (*See* Plf.'s Opening Bf, DE 20, p. 11-13, 16-17; Plf.'s Reply, DE 26, p. 1-2.) This argument lacks merit.

Despite the fact that the Plaintiff did not allege disability as a result of any mental limitation, the ALJ requested that she undergo a psychological examination, which took place on March 21, 2007 with Dr. Choate. In his findings, the ALJ explicitly noted the Plaintiff's documented diagnosis of depression, and Dr. Choate's report that the Plaintiff showed signs and symptoms of conversion and dysthymic disorders. After determining that the Plaintiff may fulfill the threshold Part "A" criteria of Listing 12.04 for affective disorders, the ALJ proceeded to consider the extent to which the Plaintiff's emotional problems caused limitations, pursuant to the technique set forth in 20 C.F.R. § 404.1520(a). *See Craft v. Astrue*, 539 F.3d 668, 674-75 (7th Cir. 2008) (finding that if the claimant has a medically determinable mental impairment, then the ALJ must document that finding, and rate the degree of functional limitation in four broad areas known as the "B criteria": activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 *et. seq.*).

The ALJ stated that the Plaintiff's mental impairment caused a mild limitation in her ability to perform daily activities, because it appeared that her ability to carry out a routine was mostly limited by her physical impairments. Specifically relying on Dr. Choate's report, the ALJ concluded that the Plaintiff carries out a fairly normal routine, as she is able to complete paperwork, wash clothes, cook, and have conversations with her family. The ALJ determined that the Plaintiff suffers no more than mild limitations with social functioning, because the record showed no instances of altercations with the public or authority figures, no evidence of

social isolation, and because Dr. Choate reported that she relates well with her family and takes good care of her appearance and hygiene. As far as difficulties in maintaining concentration, persistence, and pace, the ALJ took into consideration the Plaintiff's reported problems with memory. But the ALJ also considered the fact that during her examination with Dr. Choate, the Plaintiff did not have any problems with concentration, memory, attention, or thought process. Further, the Plaintiff's history revealed her consistent ability to adequately complete questionnaires and recall dates and medications. The ALJ documented the Plaintiff's ability to present her case at the hearing in a reasonable fashion without signs of mental confusion, and he noted that there were no episodes of decompensation in the record—the Plaintiff never required hospitalization or emergency care as a result of her depression or other mental impairments, and she received little regular treatment for mental or emotional problems.

    With no more than mild limitations in the first three of the B criteria, and no limitation in the fourth area, the ALJ determined that the Plaintiff's mental impairments were non-severe. *See* SSR 86-8 (an impairment is not severe if it is a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on the individual's physical or mental ability to perform basic work activities). In so finding, and as this Court has detailed, the ALJ properly discussed the Plaintiff's significant medical history and examination findings, properly elaborated on the functional limitations considered in determining the severity of the Plaintiff's mental impairments, and properly made specific findings as to the degree of the limitation in each of the functional areas. *Craft*, 539 F.3d at 675. Those emotional limitations, combined with her physical ailments, did not prohibit the Plaintiff from performing sedentary

work. Thus, the ALJ's findings as to the Plaintiff's mental deficiencies were supported by substantial evidence and are upheld.

**D.      Physical Limitations: Fibromyalgia and Gastrointestinal Problems**

The Plaintiff argues that the ALJ did not understand the nature of fibromyalgia, and did not consider the pain and chronic fatigue that limits her ability to work a regular forty hour work week. (*See* Plf.'s Opening Bf, DE 20, p. 11.) The Plaintiff also asserts that her "[p]eriodic bouts of diarrhea could preclude the performance of sedentary work." (*See* Plf.'s Reply, DE 26, p. 7.) These arguments are also without merit.

Fibromyalgia is difficult to diagnose by objective evidence but can produce disabling pain. Similarly, the Plaintiff's ulcerative colitis, although severe, was really only indicated by diarrhea. Even so, the Court is limited in its review by the legal definition of disability under the Social Security Act, and must determine whether the Commissioner's findings of fact are supported by substantial evidence. *See Estok v. Apfel*, 152 F.3d 636, 642 (7th Cir. 1998).

The ALJ found that the Plaintiff's fibromyalgia, ulcerative colitis, and irritable bowel syndrome were severe impairments—that these ailments significantly limited her ability to perform basic work activities. *See* 20 C.F.R. § 404.1521. However, the ALJ also noted that while the Plaintiff used a cane for ambulation, there was no indication that such an assistive device was actually necessary for routine walking. The Plaintiff was able to get around on a regular basis, showed no signs of neurological compromise or significant loss of strength, had only a diminished range of motion in her neck and lumbar regions, and was repeatedly found to have a normal gait. The ALJ also explained that the Plaintiff, while having experienced abdominal pain

and some diarrhea associated with ulcerative colitis and irritable bowel syndrome, did not experience gastrointestinal complications. In any event, it was reiterated many times in the medical records that the Plaintiff's pain and symptoms were stable, and for the most part were controlled by medication. The Plaintiff ranked her pain as a 5 out of 10 on a numeric pain scale, and could never recall a time that her pain was so severe that she went to a doctor for that reason. The ALJ noted the Plaintiff's conservative treatment of her fibromyalgia, and also noted the repeated reports that her gastrointestinal conditions were stable.

Given the extensive evidence that the Plaintiff could perform jobs that did not require much walking or standing, and that took into consideration the distraction caused by pain and fatigue, this Court concludes that substantial evidence supports the Plaintiff's not being disabled by fibromyalgia or any other condition. The ALJ's determination that The Plaintiff was capable of performing sedentary work is consistent with the record. Even if reasonable minds could disagree, the Court must affirm the ALJ's decision denying benefits where the correct legal standard was used and substantial evidence supports it. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).

As the vocational expert confirmed, with the RFC of sedentary work assigned, The Plaintiff could return to the demands of her past relevant work as an administrator and assistant director.

## CONCLUSION

For the foregoing reasons, this Court AFFIRMS the decision of the Commissioner.


SO ORDERED on November 13, 2009.

  s/ Theresa L. Springmann
_____
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION